## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SCOTLAND WILLIAMS, | * | |
| Plaintiff | * | |
| v | * | Civil Action No. ELH-13-2931 |
| GARY MAYNARD, et al. | * | |
| Defendants | * | |
| | *** | |

## MEMORANDUM

The self-represented plaintiff, Scotland Williams, a Maryland prisoner incarcerated at North Branch Correctional Institution ("NBCI"), filed a civil rights suit against Gary Maynard, former Secretary of the Maryland Department of Public Safety and Correctional Services; former Warden Bobby P. Shearin; J. Michael Stouffer, former Commissioner of Correction; and former Warden Frank Bishop, alleging that NBCI institutional directive 220.0007 improperly restricts his access to reading materials, including legal publications, in violation of his rights under the Frist Amendment.  ECF 1 at 10.  ECF 1; ECF 24.[1]  He also complains, *inter alia*, about "arbitrary denials" of prisoner access to library materials and the denial of "substantial library services" to prisoners in segregation.  *Id.* at 10.  Plaintiff seeks declaratory and injunctive relief invalidating the directive as well as monetary damages.  ECF 1 at 14.  His suit is supported by exhibits.  ECF 1-1.

Defendants have moved to dismiss or, in the alternative, for summary judgment.  ECF 16; ECF 28.[2]  Plaintiff has filed a partial response.[3]  No hearing is necessary to resolve this

---

[1]Bishop was added as a defendant in an Amended Complaint.  *See* ECF 24; ECF 26.

[2] In this Memorandum, citations to page numbers are generally to the page numbering generated by the court's electronic filing system.

matter.  Local Rule 105.6 (D. Md. 2014).  For the reasons that follow, defendants' motions, construed as motions for summary judgment, shall be granted.

## I.   Factual Background

Williams complains that NBCI, a "practically new state-of-the-art facility," has no law library.  ECF 1 at 5.  Moreover, Williams notes that only general population inmates have access to the "institution's library [, which] has a collection of general fiction and non-fiction books" and other periodicals.  *Id.*  But, the inmates in Housing Unit #1 ("HU1"), which houses prisoners on administrative or disciplinary segregation, have no such access.  Williams also claims that each housing unit, with the exception of HU1, has a small library, which includes computers that provide access to the "premise database" and other information.  *Id.*; *see also id.* at 4.

---

[3]Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), on April 25, 2014, and January 20, 2015, plaintiff was notified that defendants had filed a dispositive motion, the granting of which could result in the dismissal of his action.  *See* ECF 17; ECF 29.  Plaintiff was also informed that he was entitled to file materials in opposition to that motion within seventeen days from the date of each letter, and that his failure to file a timely or responsive pleading or to illustrate, by affidavit or the like, a genuine dispute of material fact, could result in the dismissal of his case or in the entry of summary judgment, without further notice of the court.  *Id.*

Plaintiff sought and was granted additional time to respond, to and including March 4, 2015.  ECF 23, 25-26, 33-35.  Plaintiff was advised that no further extensions would be granted.  ECF 35.

On March 9, 2015, the court received plaintiff's "Exhibit D," which indicates that, due to the volume of declarations, exhibits, and pages needed to respond to the dispositive motion, his response was being forwarded in separate envelopes.  ECF 36.  The exhibits consist of magazines and catalogues.  There is no indication as to their relevance to plaintiff's claims.  And, on March 11, 2015, the court received correspondence from plaintiff indicating that, due to his indigency, he would need to forward his opposition in separate envelopes.  ECF 37.

The court is mindful of plaintiff's limited access to materials and his indigency status.  But, the first dispositive motion was filed eleven months ago.  Plaintiff should be aware of his limited access to postage and materials when prioritizing his litigation efforts. The court cannot further delay resolution of the pending motions.

According to Williams, the "general information requests" of inmates confined at HU1 are rarely honored.  *Id.*  He states that library services for HU1 are "sorely lacking." *Id.* at 5.  For example, periodicals are not available to segregation inmates and books lent to segregation inmates "mysteriously come-up missing, and prisoners are held financially responsible for paying questionably exorbitant fees. . . ." *Id.* at 6.  As a result, that inmate's library services are suspended until the fee is paid.  *Id.*

Given these limitations, segregation inmates purchase books, periodicals, and reference materials from prison-approved vendors. *Id.*  Williams states that the Division of Correction permits inmates to receive any mail and reading materials consonant with the law and prison regulations, *id.*, and that "there is no limit on the volume of mail prisoners may receive." *Id.* at 7.

According to Williams, in January 2013, Warden Shearin changed an institutional directive, and as a result, NBCI prisoners are restricted to ordering books only from vendors listed on the institutional directive change notice.  *Id.* at 7.  Plaintiff maintains that the only approved vendors are Christian Book Distributors and Hamilton Books.  He states that neither vendor has any "books for prisoners wishing to challenge their criminal conviction or or [sic] conditions of prison confinement."  *Id.* at 7-8.  Moreover, neither offers legal periodical subscriptions.  *Id.* at 8.

Williams alleges that defendants "have refused to provide a valid rational connection between the prison directive that bans ordering books and catalogs from unapproved vendors and the legitimate Governmental interest put forward to justify it."  *Id.* at 8.  He claims that the limitation of authorized vendors coupled with the lack of a law library and limited availability of the general library to segregation inmates constitutes an "abuse of discretion" and is an

3

unconstitutional burden on his ability to exercise his First Amendment rights.  *Id*. at 9-10. Williams specifically claims that the limitations have "hindered [his] efforts at identifying materials needed for post-conviction relief."  *Id*. at 10.  Further, he claims that the limitation has affected his "quest for legal information," *id.*, and has caused him to suffer mental deterioration, anxiety, and depression.  *Id*. at 11.

Williams asserts that Shearin changed the directive without authorization from Maynard, then Secretary of the Department of Public Safety and Correctional Services, and Stouffer, then Commissioner of Correction.  *Id*. at 8.  Nevertheless, he claims that Maynard and Stouffer had "actual and constructive knowledge" of Shearin's failure to obtain authorization to change the directive and took no steps to alter or amend the directive.  *Id*. at 8-9.  In addition, Williams states that he exhausted all available administrative remedies. *Id*. at 11-12; *see also* ECF 1-1 at 3-10.

By way of an amended complaint, ECF 24, Williams added the then current Warden of NBCI, Frank Bishop, as an additional defendant.  *Id*.

Defendants indicate that NBCI is a maximum security prison housing approximately 1500 maximum security inmates, the majority of whom are serving life terms. ECF 16-2, Ex. A, Declaration of then Warden Shearin at ¶ 5.[4]  Shearin avers that NBCI's population tends to contain those inmates with longer sentences and a history of increased violence, gang affiliations, poor institutional adjustments, risk of escape, and/or assaultive behavior.  *Id*.

According to Shearin, contraband, including weapons and drugs, and on one occasion handcuff keys, entered NBCI concealed in books sent by individuals posing as legitimate

---

[4] Shearin's Declaration, dated August 21, 2013, was originally filed as an exhibit in the case of *Farewell v. Shearin*, PJM 13-1204, which raised the same issues as are presented here. *See* ECF 16-1 at 2 n.1.  I have incorporated here much of Judge Messitte's analysis.

vendors. *Id*. ¶¶ 6, 7. The contraband "adversely affect[ed] the security of the institution." *Id*. ¶ 7. Therefore, on July 13, 2012, NBCI changed its Institutional Directive 220.007.1 concerning books, to read as follows: "Inmates at NBCI will not be allowed [to] order books unless they are preapproved correspondence courses for Education and/or Religious courses." *Id*. ¶ 6.

On January 11, 2013, the Director of Program Services, in response to an Administrative Remedy Process ("ARP") filed by another inmate at NBCI, ordered the institutional directive changed in order to conform to Division of Correction Directives. *Id*. ¶ 6. On January 16, 2013, because of security concerns, *id.* ¶ 7, the institutional directive was changed to read as follows, *id.* ¶ 6:

> Inmates at NBCI may order books only from vendors approved by the appropriate Department Head/Unit Manager, Chief of Security and/or the Assistant Warden. The books must meet the criteria set forth in DCD.250.0001, DOC regulations, and NBCI.ID.250.0001.01.1 and may not exceed the 1.5 cubic feet allowed for storage space set forth in the "Allowable Inmate Property Matrix" for books/papers and magazines/newspapers.

*See also* ECF 16-4 at 116.

All incoming books are processed through NBCI's property room, where they are x-rayed, scanned and visually inspected for signs of tampering and for the presence of contraband. ECF 16-2, ¶ 9. Three officers assigned to the NBCI Property Room are responsible for receiving, examining, and distributing all inmate property arriving at the institution. *Id*. Warden Shearin did not personally review inmate requests for books. *Id*.

On October 23, 2012, copies of Black's Law Dictionary were placed in each Housing Unit and in the main library at NBCI for inmate use. ECF 16-3, Declaration of Rebecca Hammons, NBCI Librarian, Ex. B, ¶ 4. Computers containing legal dictionaries are present in the main library and in the general population housing units. *Id*.

Inmates on segregation, normally housed on HU1, are required to request legal materials from the library using institutional mail. *Id*. ¶ 5.  The legal material is forwarded to the inmate. If the library does not have the item requested, the inmate can request the item from the Library Assistance for State Institutions ("LASI") service. *Id*. ¶ 7.  Defendants submitted the "Required Reference List for Maryland prison libraries," which demonstrates the extensive materials available to Williams.  ECF 16-3 at 4-11.

Plaintiff's case management notes reflect that he has rarely been off segregation at NBCI. ECF 16-4, Ex. C at 80-102.  Nevertheless, Hammons averred that plaintiff has requested and received numerous legal materials from the library and through LASI, and has not been denied access to legal materials kept and maintained by the NBCI library or the LASI program.  ECF 16-3, ¶¶ 6, 8.  In fact, the legal materials requested by and provided to plaintiff from December 2011 to February 2013 are extensive.  ECF 16-4 at 4-68.

### Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  ECF 12.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P.

12(d).  When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[5]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.).  This discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id.* at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, *supra*, 637 F.3d 435, 448-49 (4th Cir. 2011).  However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for

---

[5] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). And, "to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for

8

summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Plaintiff has not filed a Rule 56(d) affidavit.  But, he has submitted  other exhibits. Moreover, I am satisfied that it is appropriate to address the defendants' motion as one for summary judgment, because this will facilitate resolution of the case.

Summary judgment is governed by Fed. R. Civ. P. 56(a).  It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986).

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Moreover, the court may not make credibility determinations on summary judgment. *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis,* 290 F.3d at 644-45.  Indeed, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See*, *e.g.*, *Boone v. Stallings*, 583 Fed. App'x. 174 (4th Cir.) (per curiam).

However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact.  *See Anderson*, 477 U.S. at 247-48.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment.  *Id.* at 248.  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252.  And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## II. Discussion

A.  Supervisory Liability

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in §1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983).   Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

Williams's claims against Secretary Maynard and Commissioner Stouffer fail on this basis. Plaintiff has pointed to no action or inaction on their part that resulted in a constitutional injury. Accordingly, his claims against them shall be dismissed.

B.     First Amendment

Prisoners have a limited First Amendment right to send and receive mail. *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989); *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir. 2006). The material sought by plaintiff was to be obtained via the mail. Regulations that affect the sending of mail to prisoners are centrally concerned with maintenance of prison order and security, and are measured under the reasonableness test of *Turner v. Safley*, 482 U.S. 78 (1987). In upholding a prison regulation which permitted the ban of certain publications upon a determination by the warden of the prison that the publication is "detrimental to the security, good order, or discipline of the institution or ... might facilitate criminal activity," the Supreme Court stated that security concerns must be balanced against the First Amendment interest involved in providing publications to inmates. *Thornburgh*, 490 U.S. at  417. Such regulations are valid if reasonably related to legitimate penological interests, giving prison officials considerable deference in regulating the delicate balance between prison order and demands of "outsiders" who seek to enter the prison environment. *Id.*; *see also United States v. Stotts*, 925 F.2d 83, 87-88 (4th Cir. 1991) (regulations regarding legal mail reasonably related to penological interests); *Vester v. Rogers*, 795 F.2d 1179, 1183 (4th Cir. 1986) (upholding restrictions on prisoner's correspondence to other prisoners).

In examining the action of prison officials under the *Thornburgh* and *Safley* standards, this court must determine (1) whether the governmental objective underlying the regulations is legitimate, neutral and rationally related to that objective; (2) whether there are other ways a

prisoner may exercise his right to receive information; (3) what impact the accommodation of the asserted constitutional right will have on others in the prison; and (4) whether there exists an obvious, easy alternative to the regulation to ensure that the regulation is not an exaggerated response to prison concerns. *See Thornburgh*, 490 U.S. at 417-418; *Safley*, 482 U.S. at 90.

In my view, the Institutional Directive is reasonably related to a valid security concern designed to prevent the smuggling of contraband into the prison and to protect others within the prison. As in *Thornburgh*, the Institutional Directive here was unrelated to the suppression of expression. Rather, it was enacted in order to further the important penological goal of institutional security by limiting the introduction of contraband into the facility.

Further, plaintiff has not established that he was harmed by the institutional directive, because alternative means of expression are available to him. Williams has not pointed to any specific information he sought that was not available to him through a request to NBCI's library or through LASI. Plaintiff has access to books and legal materials, as well as the ability to write and receive correspondence.

In *Farewell v. Shearin*, Civil Action No. PJM-13-1204 (D. Md.), Judge Messitte addressed the constitutionality of the same directive at issue here. *See* ECF 26 in Case No. 13-1204 (filed March 12, 2014). He stated, *id.* at 9: "No easy alternative to the regulation is readily apparent. Limiting receipt of books from authorized vendors in order to advance institutional security is not an exaggerated response to prison security concerns."

I agree with Judge Messitte's analysis. Therefore, plaintiff's First Amendment rights were not violated under the facts presented here.

C.    Access to the Courts

To the extent that plaintiff alleges that the limitation on his receipt of books adversely

impacted his ability to file or prepare for lawsuits, his claim fails.  To be sure, prisoners have a

constitutionally protected right of access to the courts.  *Bounds v. Smith*, 430 U. S. 817, 821

(1977).  However, in *Lewis v. Casey*, 518 U. S. 343, 355 (1996), the Court said:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into
> litigating engines capable of filing everything from shareholder derivative actions
> to slip-and-fall claims.  The tools it requires to be provided are those that the
> inmates need in order to attack their sentences, directly or collaterally, and in
> order to challenge the conditions of their confinement.  Impairment of any other
> litigating capacity is simply one of the incidental (and perfectly constitutional)
> consequences of conviction and incarceration.

"Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of

access to the courts must show 'actual injury' to 'the capability of bringing contemplated

challenges to sentences or conditions of confinement before the courts.'"  *O'Dell v. Netherland*,

112 F. 3d 773, 776 (4th Cir. 1997) (*quoting Lewis*, 518 U.S. at 355).  "The requirement that an

inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the

doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks

assigned to the political branches."  *Lewis*, 518 U.S. at 349.  Plaintiff has not pointed to any

injury; his vague assertion that he has been unable to research issues related to post-conviction

relief is not actionable.

D.      Failure to follow directives

As noted above, the court finds that the Institutional Directive regarding receipt of

publications from outside vendors does not violate plaintiff's First Amendment rights.  To the

extent that written directive or procedures were not followed to the letter in the adoption of the

directive, the adoption of procedural guidelines does not give rise to a liberty interest.

Regardless of any alleged violations of internal regulations, the law is settled that the failure to

follow a prison directive or regulation does not give rise to a federal claim, if constitutional

minima are met.  *See Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996).  Thus, the failure to follow regulations does not, in and of itself, result in a violation of due process.  *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987).

E.     Equal protection

To the extent Williams alleges his right to equal protection has been violated, his claim also fails. The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U. S. 432, 439 (1985) (citation omitted).  In cases where no suspect criterion such as race is involved, the proper inquiry is whether the statute or regulation serves a legitimate state interest and whether the challenged classification is rationally related to it.  *See Moss v. Clark*, 886 F. 2d 686, 690 (4th Cir. 1989).   Even in the case where a suspect class is involved, prison regulations must only meet a test of reasonableness; they are not subjected to strict scrutiny. *See Washington v. Harper*, 494 U.S. 210, 223 (1990) (rule of *Turner v. Safley* that regulations need only be reasonably related to legitimate penological interest applies beyond First Amendment context); *Turner,* 482 U.S. at 89.

Williams has failed to show that he has been treated differently from other inmates assigned to segregation at NBCI.  To the extent he alleges he was treated differently than general population inmates, in that he could not physically access the library at NBCI, his claim fails, because he is not similarly situated to those inmates.  Moreover, the difference in treatment of inmates on segregation status is rationally related to the heightened security concerns of inmates housed on segregation and the consequent restriction in their movement.

**Conclusion**

The motion for summary judgment filed on behalf of Gary Maynard, J. Michael Stouffer, Bobby P. Shearin, and Frank Bishop will be granted.[6]   Plaintiff's requests for declaratory and injunctive relief are denied.   A separate Order follows.


March 12, 2015                                      /s/
Date                                                Ellen L. Hollander
                                                    United States District Judge

---

[6] Because I found no constitutional injury, I need not address defendants' alternative claim of qualified immunity.